DAVIS *v.* STATE.

## Opinion delivered March 1, 1926.

1. INDICTMENT AND INFORMATION—GROUND FOR QUASHING INDICT-MENT.—It is no ground for quashing an indictment for murder that the grand jury in their report expressed the opinion that the accused was guilty and that a conviction on the charge should follow.

2. INDICTMENT AND INFORMATION—GROUND FOR DEMURRER.—An indictment for murder is not demurrable because the grand jury in their report expressed the opinion that the accused was guilty and that a conviction on the charge should follow.

3. VENUE—PETITION FOR CHANGE—SUPPORTING AFFIDAVITS.—A motion for change of venue in a criminal case was properly overruled, though in proper form, where it contained the supporting affidavit of only one person.

4. CRIMINAL LAW—PROOF OF ANOTHER CRIME.—On a prosecution for murder, it was error to permit the State, as original evidence, to prove that the accused had been convicted and sentenced to the penitentiary for the crime of robbery, since the proof of the latter crime does not tend to show a system to commit other crimes, nor a motive or intent to commit murder.

Appeal from Ashley Circuit Court; *Turner Butler,* Judge; reversed.

*G. P. George* and *Frank Strangways,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

WOOD, J. The appellant was convicted on an indictment which charged him with the crime of murder in the first degree in the killing of one Horace Harper. The report of the grand jury which returned the indictment against the appellant recited that it had examined into two cases very thoroughly, and had returned indictments against both, charging them with murder in the first degree; that, from all the evidence before them, they confidently felt that conviction ought to follow and the death penalty imposed. Upon the filing of this report the court ordered that the words "and the death penalty imposed" be stricken from the report. The cause was set for hearing one week after the return of the indictment. The appellant moved to quash the indictment

on the ground that the report was written by the prosecuting attorney, who requested the grand jury to allow him to make a special report containing the above language. The appellant likewise demurred to the indictment, one of the grounds being the same as that set up in his motion to quash. The court asked the appellant if he desired to take testimony on the motion to quash, and he replied in the affirmative, and asked for certain witnesses, who were not then in the courtroom. The court declined to send for these witnesses, and asked the attorney for the appellant if there were other evidence which he desired to introduce, and the attorney answered in the negative.

The testimony on behalf of the State was substantially as follows: Julia Tobins testified that she lived at Crossett, and was at the towns of Montrose, Portland and Wilmot the night Horace Harper was killed. She saw the appellant that night. He came up to Harper's car, and asked Harper to take him to Wilmot, and what the charge would be. Harper replied that it would be $2. Witness, appellant and Harper were in the front seat, and a lady and her husband were in the back seat as far as Portland. At Portland the other passengers got out, and the appellant got in the back seat. Harper told the appellant that he didn't know him, and asked him if he had just as soon pay him there as to wait, and appellant paid him. Harper then took him on to Wilmot. Appellant gave Harper a five-dollar bill. Harper went to the drug store and got the change and gave the appellant $3. Witness, appellant and Harper went nearly to Wilmot on the highway, when the appellant asked Harper to stop and let him out of the car. Appellant opened the car door and got out, and witness saw him with a pistol in his hand pointed at Harper. He didn't let Harper say anything; just told him to put his hands up and to give him (appellant) his $2. Appellant told witness to get out of the car, and witness did so. Appellant searched Harper. When appellant got ready to search him, Harper moved over to where witness had been

sitting. Appellant got the $2. He told Harper to turn his back, and appellant stepped back about a step from the car and shot Harper. Appellant shot Harper three times, and Harper jumped out of the car and ran back towards Parkdale. Appellant ran toward Wilmot. Witness followed Harper to where he fell, and called him, and he could not answer. Witness turned back toward the car, and appellant was coming from the other way loading his pistol. He asked witness where Harper was, and she told him he was gone. Appellant told witness to get through a crack in the fence. Witness started to obey, and he asked her if she could drive a car. She said she could, and appellant said, "Drive me home," and witness drove the appellant to Wilmot somewhere, at a lady's house, where he got out and went in. Witness asked a man on the porch for a drink of water, and when the man came out witness told him that the appellant had killed Harper. A boy named Frog started the car, and he and the witness drove the car to his cousin's house, a man named Hugo, where they stayed until about nine o'clock, and Hugo took witness to the sheriff's house. Witness told the sheriff about the killing. Appellant told witness that he had rather not have killed the man where he did. Witness was asked: "Q. Did he mistreat you in any way that night?" And answered, "Yes sir. Q. In what way? A. He had me to get out of the car." Appellant's counsel here objected, and the court sustained the objection to the questions and answers, and the court withdrew the same from the jury and instructed the jury to disregard them. This occurred in September, 1925, in Ashley County, Arkansas. It was not very dark at the time of the killing. Witness could see a man, as the car lights were on. She didn't know how far appellant went from the car before he came back. The first man witness told about the killing was a colored man, and she didn't know his name.

Witness Miller testified that, about the middle of September, a man came to his house and woke witness up and told him that a man was killed. Witness went

to see about it. He found the body of Harper about a half a mile north of Wilmot, in the ditch beside the highway. It was between eight and nine o'clock. Harper was shot in the right breast, ranging toward the left side. There was a spot of blood on the carrier of the car where Harper jumped out on the left side. There was a knife in the road ten or fifteen steps from the car, and witness picked it up. Witness could tell from the tracks the way Harper ran. He ran between seventy-five and one hundred yards. His pockets were turned wrong side out, that is, his right-hand pocket, and his left-hand pocket was partly turned. The knife was closed.

Huey Parker testified that he lived at Wilmot, and saw the appellant on the night Horace Harper was killed, and told the appellant that he had killed the boy, and appellant asked witness if he was dead. Witness told appellant Harper was dead, and appellant said that Harper asked for his money, and went in his pocket like he was going after his gun, and appellant shot him and jumped out and ran down the road. Witness, at this point, was asked the following by the prosecuting attorney: "Q. Now, that's not what you told me a few minutes ago, is it? A. No sir." Appellant's counsel objected. The court overruled his objection, and appellant duly excepted. The prosecuting attorney continued the examination as follows: "Q. Didn't you tell me that you asked him what he shot him for, and he shot him for his $2? A. Yes sir. Q. That's what he shot him for? A. Yes sir. Q. When I asked you, you didn't say anything like going in his pocket for a pistol? A. Yes sir; like he was going in his pocket to give it to him. Q. The reason he shot him was for his two dollars? A. Yes sir."

On cross-examination the witness stated that the conversation occurred the night of the killing. Appellant said he wanted the man to give him his money. The man started like he was going after his money, and the appellant said he thought the man was going after a gun, and appellant shot him.

Cecil Deal testified that he was the jailer and deputy sheriff of Ashley County. As such he delivered the appellant to the penitentiary in 1924 on a charge of rob-bery, on a sentence of four years. The appellant's counsel objected to the testimony. The court overruled the objection, to which ruling the appellant duly excepted.

The State then called John C. Riley, who testified, over the objection and exception of the appellant, that he was sheriff of Ashley County, and heard a conversation about thirty minutes before, between the prosecuting attorney and Huey Parker. The prosecuting attorney asked Parker if he asked appellant why he killed Harper, and Parker said that he did, and that appellant replied that he paid the nigger $2 for bringing him from Montrose to Wilmot, and before he got to Wilmot he asked the negro to give him his $2 back, and when the negro started in his pocket to get the $2 he (appellant) shot him.

Dan Parker testified, on behalf of the defense, that on the night of September 16, after appellant shot Harper, a man and a woman came to witness' house. The man was the appellant, and witness didn't know who the woman was. Appellant and a boy by the name of Riley came in, and the boy said that the appellant had killed a man.

The appellant testified in substance that Harper asked him if he could carry him (appellant) to Wilmot. Appellant got in Harper's car in the front seat. Two people got out at Portland, and appellant then got in the back seat. Harper asked the appellant to pay him at Portland. Appellant gave Harper a five-dollar bill. Harper said he would give appellant the change. When they got on the other side of Parkdale appellant told Harper that he wanted to get out there; that he was not allowed to go to Wilmot. Harper stopped the car, and appellant told the girl to get out. She did so, and started walking toward Montrose. Appellant asked Harper to give him his change, and Harper replied, "I will give you your change when we get to Wilmot." Appellant again said that he was not allowed to go to

Wilmot. Then Harper said, "G—— d——you, I will give you your change," and reached in his pocket. Appellant jumped back and shot at Harper. Appellant didn't know whether he hit him or not. Harper made a break to shoot, and appellant shot as fast as he could. Harper ran, and appellant ran too. Appellant didn't tell him to hold up his hands, and didn't go through Harper's pockets. The appellant never got his $3. It was a dark night, and the lights were out. After appellant shot Harper, appellant came back to the car and got his shirt, and he and the girl went to Maude Hunter's. It was three or four hours before the appellant found out Harper was dead.

On cross-examination the appellant was asked the following: "Q. How long had you been out of the penitentiary when you saw Harper down there? A. I don't know exactly, I left there on the last Saturday in August. Q. That's the reason you didn't want to go to Wilmot, because you had escaped from the penitentiary, and were afraid you would get caught? A. Yes sir."

The jury returned a verdict finding the appellant guilty of murder in the first degree, as charged in the indictment. From the judgment sentencing the appellant to electrocution is this appeal.

1. The fact that the grand jury in their report expressed the opinion that the appellant was guilty of the crime charged in the indictment, and that a conviction on the charge should follow, was not a ground for quashing the indictment. The indictment itself was a mere accusation against the appellant, and an expression of the conviction of the grand jury that the appellant was guilty of the crime with which the grand jury charged him. But that fact did not tend to impeach the qualifications of the members of the grand jury which returned the indictment. The record shows that the appellant was given an opportunity, before the indictment was returned against him, to challenge the members of

the grand jury, and he offered no objection to the qualifications of any of the jurors.

The court did not err in refusing to send for witnesses to be examined on the motion to quash, because the grounds alleged therein, if proved, did not constitute any reason for the quashing of the indictment. No objection was made by the appellant to the qualifications of the grand jurors when he was given an opportunity to challenge the panel before the indictment was lodged against him. *Tillman* v. *State,* 121 Ark. 322; see also *Ware* v. *State,* 146 Ark. 321.

2. The court did not err in overruling the demurrer to the indictment. The grounds alleged in the demurrer, if true, did not show that the indictment was defective. The indictment contained all the necessary allegations to constitute a valid indictment for murder in the first degree.

3. The court did not err in overruling the appellant's motion for change of venue. While the motion itself was in proper form, it contained only the supporting affidavit of one person. The statute requires that the motion shall be supported by the affidavits of two credible persons. Section 3088, C. & M. Digest, and cases there collated.

4. The court erred in permitting the prosecuting attorney to prove by the jailer and deputy sheriff of Ashley County that he delivered the appellant to the State Penitentiary; that the appellant was sent up for robbery, on a four-year sentence. This testimony was objected to by the appellant, and it was wholly incompetent and highly prejudicial. The error was not cured by the appellant's answer to questions of the prosecuting attorney on his cross-examination as a witness, to the effect that he had been in the penitentiary, and that the reason he didn't want to go to Wilmot was that he had escaped from the penitentiary, and was afraid he would get caught. These answers do not disclose that the appellant had been sentenced to the penitentiary for robbery. For aught that appears to the contrary in the

answers of the appellant on cross-examination, he may have been confined in the penitentiary for some other cause, or some other offense than that of robbery, or merely for safe-keeping. Furthermore, the witness, in answer to questions propounded to him, cannot be put in the attitude of making a voluntary confession that he was guilty of the heinous offense of robbery, because he answered truthfully the questions that were asked him by the prosecuting attorney on cross-examination. The prosecuting attorney, to be sure, in order to test the credibility of the witness, would have the right to ask him on cross-examination if he had not been convicted and sentenced to the penitentiary for the crime of robbery. But it is altogether a different question when the prosecuting attorney was permitted, over the objection of the appellant, to introduce, as original evidence, on the charge of murder in the first degree, that the appellant had been convicted and sentenced to the penitentiary for the crime of robbery. It is a thoroughly settled doctrine of criminal law that a party accused and on trial for one crime cannot be convicted by proving that he has committed another and a different crime, when the other and different crime does not tend to show a system to commit other crimes also, and motive or intent to commit the crime for which the prisoner is on trial. *Stone* v. *State,* 162 Ark. 154; *Davis and Thomas* v. *State,* 117 Ark. 296; *Setzer* v. *State,* 116 Ark. 226.

Other assignments of error are argued in appellant's brief, but we deem it unnecessary to discuss these assignments. Some of these alleged errors will not likely arise on another trial. We find no reversible error in the record, except the one indicated, but for this the judgment is reversed, and the cause is remanded for a new trial.